**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
|                              :
MICHAEL A. PIKOWSKI,          :
|                              :        Civil Action No.: 11-2732 (FLW)
|             Plaintiff,       :
|                              :
|       v.                     :
|                              :        **OPINION**
GAMESTOP, INC., *et al.*,      :
|                              :
|             Defendant(s).    :
_____:

**WOLFSON, District Judge:**

Plaintiff Michael Pikowski ("Plaintiff") brings this suit against his former employer, Defendant GameStop, Inc. ("GameStop" or "Defendant"), alleging that GameStop violated New Jersey's Law Against Discrimination ("NJLAD") by harassing, discriminating, and retaliating against Plaintiff based on his disabilities. In the instant matter, Defendant moves for summary judgment on all claims. For the reasons set forth below, the motion is **GRANTED** in part and **DENIED** in part; Defendant's motion as to Plaintiff's claim for hostile work environment is denied, however, all other claims are dismissed.

**BACKGROUND**

The following facts are undisputed unless otherwise noted. Plaintiff has been diagnosed with Asperger's Syndrome, obsessive-compulsive disorder ("OCD") with contamination phobia, anxiety, and depression. For the purposes of this motion, there is no dispute that Plaintiff is considered disabled under

the NJLAD.

From November 2006 until February 2011, Plaintiff was an employee of GameStop, a major video game retailer. In November 2006, Plaintiff was hired as holiday seasonal help by Joe Keller, former store manager of GameStop at the Phillipsburg Mall in Phillipsburg, New Jersey (the "Phillipsburg store"). *See* Pikowski's Dep. at pp. 69-70. Because Plaintiff was a long-time customer of the store, Keller was well aware of Plaintiff's disability prior to his employment. Pikowski Dep. at pp. 101, 103-04. After the 2006 holiday season ended, Plaintiff continued to work at the Phillipsburg store as a Game Advisor. *See* Def.'s Statement of Undisputed Facts ("Def. Facts") at ¶¶ 5, 8.

At some point, Keller promoted Plaintiff to a Lead Game Advisor ("LGA"). *See* Pikowski Dep. at p. 97. As a LGA, Plaintiff could use a store key to open and close the store when the managers were unavailable, although that was not his primary responsibility. Def. Facts at ¶ 10. Additionally, Plaintiff was responsible for meeting certain sales goals. *Id.* at ¶ 11. According to Plaintiff, cleaning the bathroom was the only duty that his disability prevented him performing. *See* Pikowski Dep. at p. 103.

At some point before October 2009, Plaintiff visited another GameStop store located in the same Phillipsburg Mall to browse its merchandise. *See* Def. Fact at ¶ 24. Because of his contamination phobia, Plaintiff preferred purchasing new, sealed video games that have not been touched by other customers. *Id.* at ¶ 25; Pikowski Dep. at p. 118. Plaintiff asserts that managers at GameStop were aware of his preference. Pikowski Dep. at p. 118.

When Plaintiff asked the manager of this GameStop location, Ray Rivera, if he could look at the sealed, untouched games because of his phobia, Rivera allegedly yelled, "there's nothing wrong with you; get the fuck out of my store." *Id.* Thereafter, Plaintiff called David Afram, the district manager, to complain about the incident. *Id.* at pp. 118-19. To rectify the situation, Afram set up a meeting wherein Rivera apologized to Plaintiff. *Id.* at p. 120. However, Plaintiff alleges that Keller later informed him that Afram called Plaintiff "weird." *Id.* at p. 125.

In October 2009, Keller was terminated from his position at the Phillipsburg store, *see* Def. Facts at ¶ 13, and Plaintiff testified that thereafter "everything went downhill." Pikowski Dep. at p. 108. After Keller's departure, the Assistant Store Manager ("ASM") became the interim Store Manager ("SM"), the Senior Game Advisor ("SGA") became the ASM, and Plaintiff was promoted to interim SGA. *See* Def. Fact at ¶ 14. During Plaintiff's brief promotion as a SGA, he worked more hours, trained the seasonal employees, and carried a key at all times to open and close the store. *Id.* at ¶ 15. There were no SGA duties that Plaintiff could not perform because of his disabilities, and no reports that Plaintiff performed poorly as SGA. *Id.*

Once GameStop hired a new permanent SM at Plaintiff's store, Plaintiff resumed his position as LGA. The new manager, Mike Stefanic, who had been trained by Rivera, hired Bill Mullen to fill the SGA vacancy, even though Plaintiff had expressed his desire to become the permanent SGA. *See* Pikowski Dep. at 143; Def. Facts at ¶¶ 19, 20. Mullen, who had never worked for

GameStop, was trained by Plaintiff for two months. *See* Pikowski, Dep. at pp. 111-12, 142.

Two weeks after Mullen was hired as SGA, Plaintiff met with Don Dinnen, who was the interim district manager ("DM") to discuss his displeasure with being "passed over" for the SGA position. Def. Facts at ¶¶ 21, 22. At that meeting, Dinnen told Plaintiff that there were currently no SGA openings. *Id.* Shortly after that meeting, Stefanic was transferred to another store and Chris Fego became the new SM of the Phillipsburg store. Pikowski Dep. at p. 116.

At some point before September 2010, Plaintiff called his store to reserve a copy of the "StarCraft II Limited Edition" game. Def. Facts at ¶ 68; *See* Def.'s Ex. H. Fego was working in the store when Plaintiff went to pick up his reserved game. Pikowski Dep. at p. 138. According to Plaintiff, Fego proceeded to rub an HDMI cable, which he told Plaintiff had been contaminated with "dog poo," all over the reserved game.[1] *Id.* Since there was only one copy available at that time, Plaintiff, nevertheless, purchased the "contaminated" game. *Id.* at 139.

After this incident, Plaintiff reserved a "Halo Reach" console at the Phillipsburg store and asked Fego to make sure that his console didn't "get bumped" because of his OCD. Pikowski Dep. at p. 124. Plaintiff purchased the $400 console and was later told by two employees that Fego had "kicked [the console] across the floor" before Plaintiff purchased it. *Id.* Plaintiff's account of this incident is disputed by Defendant. Defendant insists that Fego

---

[1] There is a dispute as to whether Fego rubbed the cord of Plaintiff's game or held the cord at arm's length. *See* Anthony Sepe's Decl. at ¶ 2.

had not kicked the console out of spite, but rather "slid the box from one side of the cash wrap to the stockroom, as he would do any other system shipment that came in." Kalinsky Dep. at p. 41.

Around this time, Plaintiff began drinking more heavily, became more depressed, and attempted suicide. Def. Facts at ¶ 47. Plaintiff was also arrested for driving under the influence of alcohol. *Id.* at ¶ 48. Plaintiff alleges that his depression was attributed to the fact that he was not promoted to SGA and his working conditions at GameStop. *See* Pikowski Dep. at pp. 126-27. To treat his depression, Plaintiff spent one weekend as an inpatient at Somerset Medical Center, and subsequently, spent five weeks in an outpatient therapy program. Def. Facts at ¶ 50. During this time, Plaintiff was only scheduled for work on weekends and evenings. *Id.* at ¶ 51. Eventually, Plaintiff's therapy schedule was reduced to three days a week and his hours were increased at work. *Id.* at ¶ 52.

On September 21, 2010, Plaintiff's mother, Cathy Rinko-Weidner, emailed Deborah Warren, GameStop's Field Human Resources Manager, complaining that her son had been discriminated against because of his disabilities. Def. Facts at ¶ 53; Def.'s Ex. E. Her letter specifically detailed the incidents with Fego, Rivera, and Afram. *Id.* Moreover, Rinko-Weidner further complained that Plaintiff "ha[d] been passed over for promotion even though he did the specific position of SGA for approximately 5 months and with each new SGA that is hired, he continues to assume SGA duties." *Id.* The email stated

that Plaintiff was "experiencing tremendous anxiety from being the butt of Gamestop's managers discriminating against him . . . ." *Id.*

Rinko-Weidner then followed up the next day with another email to Warren which named the parties that Plaintiff believed had discriminated against him. Def. Facts at ¶ 54; Def.'s Ex. T. This supplementary email alleged that Rivera "verbally expressed his opinion that [Plaintiff] was not ready for [the] SGA position before [Mullen] was hired." Def.'s Ex. T. Plaintiff claims to have learned this information from a co-worker. *See* Pikowski Dep. at p. 145. According to GameStop, all of Plaintiff's complaints were investigated. Def. Facts at ¶ 61; Def.'s Ex. F.

Plaintiff then met with the DM, Anthony Sepe, to discuss Plaintiff's complaints and opportunities for promotion. Def. Facts at ¶ 66. Sepe informed Plaintiff that there was an open SGA position at another GameStop store in Easton, Pennsylvania (the "Easton store"), and that a transfer to that store would present Plaintiff with the best chance of being promoted. *Id.* at ¶ 67. Plaintiff maintains that Sepe told him that as long as he kept his "numbers" high, he would be promoted. *Id.* at ¶ 68. Based on that conversation, Plaintiff decided to transfer to the Easton store and began working there in October 2010. *Id.* at ¶ 69.

According to Plaintiff, he experienced further discrimination and harassment at the Easton Store. In particular, Plaintiff alleges that he was harassed and humiliated by the Store Manager, Marvin George. *See* Pikowski Dep. at p. 155. Plaintiff testified that he spoke with George's wife, who was

training to become a social worker, about his disabilities. *Id.* at 155-56. Plaintiff stated that after he spoke to George's wife, George started calling Plaintiff "sped" and "retard." *Id.* George denied these allegations. *See* Kalinsky Dep. at p. 44.

On December 21, 2010, Plaintiff was working with George behind the cash wrap counter. Def. Facts at ¶ 70. George was helping a customer while Pikowski was stocking the shelves, with his back towards the customers. *Id.* at ¶ 71. George then, without turning around, kicked Plaintiff in the buttocks. *Id.* at ¶ 72. George told GameStop management that he kicked Plaintiff to get his attention—not to physically harm him. Def's Ex. F. Although Plaintiff was not physically harmed, he testified that he was embarrassed because the incident took place in front of customers. Pikowski Dep. at pp. 160-61. Plaintiff testified that, after the incident, he "just wanted to stay in bed and be left alone." Pikowski Dep. at p. 176. Further, Plaintiff suspected that George kicked him "because [his] processing speed is really slow" due to his disability. *Id.*

Following the incident, Plaintiff was excused from work until January 7, 2011, because his doctor diagnosed him with "fatigue" and a "viral syndrome." *Id.* at ¶ 83. In an email to Eric Kalinsky, the Field Human Resources Manager for the stores in the Easton area, Sepe questioned Plaintiff's medical leave: "Can I go to the doctor I have gone to for 25 years and have him write me a bogus note to have the holidays off? I think we need to verify [Plaintiff's]

doctor['s] note." Plaintiff's Ex. F.  Kalinsky testified that he told Sepe that his email was "inappropriate."  Kalinsky Dep. at p. 63.

Two days after Plaintiff was kicked by George, Plaintiff's mother sent an email to Warren alerting her to the incident, and informing Warren that George had been calling Plaintiff "sped" and "retard." Def. Facts at ¶ 85.  On December 27, 2010, Kalinsky and Plaintiff spoke over the phone regarding the kick.  *Id.* at ¶¶ 87, 91.  During this conversation and in a follow-up email, Plaintiff requested to return to the Phillipsburg store.  *Id.* at ¶ 92; Def's Ex. L.  Kalinsky informed Plaintiff that if he transferred back to the Phillipsburg store, his hours would be significantly reduced because the Phillipsburg store had a lower sales volume.  *Id.* at ¶ 93.

Kalinsky investigated the kicking incident and the allegations of name-calling by reviewing the surveillance tape and speaking to the Easton employees.  He determined that the appropriate course of action would be to discipline George[2] and require the entire store to complete a two-hour respectful-workplace training course.  Def. Facts at ¶¶ 101, 103.  Although George offered to apologize, Plaintiff still did not feel comfortable working at the Easton store and maintained that he wanted a transfer.  *Id.* at ¶¶ 105-06.  Kalinsky told Plaintiff that he could transfer back to the Phillipsburg store, but reiterated that Plaintiff would have reduced hours—working about 10 hours each week.  *Id.* at ¶ 107.  Plaintiff nonetheless agreed to the transfer.

---

[2]     It is unclear from the record how George was "disciplined."

Prior to his return to the Phillipsburg store, Plaintiff heard from a co-worker that Fego had said that he did not want Plaintiff back in the Phillipsburg store; however, it appears that Fego was not even aware of Plaintiff's impending return because Fego was in the hospital.[3] *Id.* at ¶ 110; Def.'s Ex. F. In an email to Kalinsky, Plaintiff wrote that when he visited the Phillipsburg store, "two former coworkers wouldn't even say hello" and that "[i]t is clear that there is a lot of hostility about [his] returning. It [made him] feel unwanted at Gamestop and thoughts of suicide started going through [his] head again." Def.'s Ex. H. Kalinsky called Plaintiff after receiving this email, left a voicemail, and followed up with another email. *See* Def.'s Ex. N.

In January 2011, Plaintiff returned to work at the Phillipsburg store as an LGA; however, this time, Plaintiff was not satisfied with his transition. Pikowski Dep. at p. 220. According to Plaintiff, "[he] was upset that . . . when [he] got back everything, [his] stuff was all [out] of the system and [he] had to basically be rehired, and [he] basically felt like [he] was fired." *Id.* Plaintiff was quickly re-entered into the store's computer system, but during his brief return to the Phillipsburg store, he was never scheduled to open or close the store by himself and he did not carry a key. Def. Facts at ¶¶ 130-31.

---

[3]     Because Plaintiff did not hear Fego's comment personally, his testimony regarding that comment is hearsay. Furthermore, Plaintiff has not deposed the co-worker who purportedly heard Fego making that statement. On a summary judgment motion, I cannot consider any hearsay statements. *See Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009) ("Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment.").

On February 6, 2011, Plaintiff submitted notice of his resignation. *Id.* at 124. In his notice letter, Plaintiff stated that he had been "overlooked for two SGA positions again, one in Hackettstown[4] and one in Easton" and "subject[ed] to constructive termination." Def.'s Ex. R. Soon after his resignation, GameStop decided to consolidate the two stores in the Phillipsburg Mall. *Id.* Kalinsky called Plaintiff to talk about his resignation and offered him a severance package, but Plaintiff did not return the call. *Id.*

After his resignation, Plaintiff initiated the instant suit against Defendant alleging that Defendant discriminated against him because of his disability in violation of the NJLAD. In that connection, Plaintiff alleges in his one-count Complaint that (1) he was subjected to a hostile work environment (disability harassment); (2) he was discriminated against because of his disabilities; and (3) Defendant retaliated against him. In the instant matter, Defendant moves for summary judgment on those claims.

## DISCUSSION

## I. Standard of Review

A moving party is entitled to judgment as a matter of law where there is no genuine issue as to any material fact. *See* FED R. CIV. P. 56(c); *Brooks v. Kyler,* 204 F.3d 102, 105 n. 5 (3d Cir. 2000) (*citing* FED R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir. 1996). The burden of demonstrating the absence of a genuine issue of material fact falls on the moving

---

[4] According to Defendant, there were no open SGA positions in Hackettstown. *See* Def.'s Ex. F.

party. *See Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 305 (3d Cir. 1999)(citations omitted). Once the moving party has satisfied this initial burden, the opposing party must identify "specific facts which demonstrate that there exists a genuine issue for trial." *Orson,* 79 F.3d at 1366.

Not every issue of fact will be sufficient to defeat a motion for summary judgment; issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Further, the nonmoving party cannot rest upon mere allegations; he must present actual evidence that creates a genuine issue of material fact. *See* FED R. CIV. P. 56(e); *Anderson,* 477 U.S. at 249 (*citing First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290 (1968)). In conducting a review of the facts, the non-moving party is entitled to all reasonable inferences and the record is construed in the light most favorable to that party. *See Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir. 1986). Accordingly, it is not the Court's role to make findings of fact, but to analyze the facts presented and determine if a reasonable jury could return a verdict for the nonmoving party. *See Brooks,* 204 F.3d at 105 n. 5 (*citing Anderson,* 477 U.S. at 249); *Big Apple BMW v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992).

## II.  Disability Discrimination and Retaliation

With respect to claims of disability discrimination under the NJLAD, New Jersey has adopted the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as the starting point. *Andersen v. Exxon Co.*, U.S.A., 89 N.J.

483, 492 (1982). Although the *McDonnell Douglas* framework is followed in cases of disability discrimination, the elements of the *prima facie* case are modified to fit the circumstances. *Clowes v. Terminix Int'l., Inc.*, 109 N.J. 575, 596 (1998); *Bell v. K.A. Indus. Services, LLC*, 567 F. Supp. 2d. 701, 706 (D.N.J. 2008). Indeed, the New Jersey Supreme Court has recognized that there is no single *prima facie* case that applies to all employment discrimination claims. *Victor v. State*, 203 N.J. 383, 408 (2010). Rather, "the *prima facie* elements of a claim vary depending upon the particular employment discrimination claim being made." In that connection, in interpreting the NJLAD in disability discrimination claims, "federal law has consistently been considered for guidance." *Borngesser v. Jersey Shore Med. Ctr.*, 340 N.J. Super. 369, 380 (App. Div. 2001); *Ensslin v. Twp. of N. Bergen*, 275 N.J. Super. 352, 363-64 (App. Div. 1994), *certif. denied*, 142 N.J. 446 (1995)); *see Chisolm v. McManimon*, 275 F.3d 315, 324 n.9 (3d Cir.2001).

Based on the allegations in this case, in order to establish a *prima facie* case of disability discrimination, Plaintiff must show that: (1) he is disabled or perceived to have a disability; (2) he was otherwise qualified for the position at issue; (3) he was subjected to an adverse employment action; and (4) the challenged employment decision took place under circumstances that give rise to an inference of unlawful discrimination. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003).

Once the employee has satisfied his burden of establishing a *prima facie* case of discrimination under the NJLAD, the burden of production then shifts

to the employer to rebut the *prima facie* case by "articulat[ing] some legitimate, nondiscriminatory reason" for its alleged unlawful action. *Clowes*, 109 N.J. at 596; *see Laresca v. AT&T*, 161 F. Supp. 2d. 323, 335 (D.N.J. 2001). "In order to defeat a summary judgment motion if the employer answers the plaintiff's *prima facie* case with [a] legitimate, nondiscriminatory reason[] for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either 1) disbelieve the employer's articulated legitimate reasons; or 2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Laresca*, 161 F. Supp. 2d at 335-36; S*heridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067 (3d Cir. 1996), *cert. denied*, 521 U.S. 1129 (1997).

In sum, when evaluating a plaintiff's discrimination claim, courts engage in the following three-step process:

> (1) the plaintiff must come forward with sufficient evidence to constitute a *prima facie* case of discrimination; (2) the defendant then must show a legitimate non-discriminatory reason for its decision; and (3) the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or discriminatory in its application.

*Henry v. Dep't of Human Servs.*, 204 N.J. 320, 331 (2010) (quoting *Dixon v. Rutgers*, 110 N.J. 432, 442 (1988)). When applying these factors, the New Jersey Supreme Court has treated federal precedent interpreting Title VII as "a key source of interpretive authority" for construing the NJLAD. *See Alexander*

*v. Seton Hall University*, 204 N.J. 219, 234-35 (2010); *Woods-Pirozzi v. Nabisco Foods*, 290 N.J. Super. 252, 268 (App. Div. 1996).

Here, Plaintiff identifies several adverse employment actions that he claims show Defendant's discriminatory animus towards him. First, Plaintiff contends that when he was transferred back to the Phillipsburg store from the Easton store, his hours were reduced drastically because of his disabilities. In addition, Plaintiff argues that the loss of key holder responsibilities and Defendant's failure to promote him are also indications that Defendant discriminated against him.

As for the first element of a *prima facie* case, there is no dispute on this motion that Plaintiff is disabled within the meaning of the NJLAD. Also, it does not appear that Defendant disputes that Plaintiff was otherwise qualified to perform the positions at issue, i.e., LGA or SGA. Instead, Defendant contends that Plaintiff was not subjected to any adverse employment action, and that any of the challenged employment decisions cannot reasonably give rise to an inference of unlawful discrimination. This Court agrees.

With respect to the reduction in hours, Plaintiff has admitted that he was informed by Kalinsky -- prior to his transfer back to the Phillipsburg store -- that he could only work approximately ten hours a week or less because of low sales volume at that store. *See* Plaintiff's Response to Def. Facts at ¶ 107. Indeed, based on the record, the decrease in revenue of the Phillipsburg store was apparent as GameStop ultimately decided to consolidate both stores at the

Phillipsburg Mall. As a condition of the transfer, Plaintiff acknowledged at his deposition that he would work fewer hours:

> Q. Eric said Mike would be transferred back to Phillipsburg but there were not enough hours, so Mike would be working about ten hours a week. Does that refresh your recollection that Eric told you that you would be working about ten hours a week [once you transferred]?
>
> A. Yes, about ten hours.

Pikowski Dep. at p. 217. Since Plaintiff was aware of, and agreed to, the reduction in hours upon returning to work at the Phillipsburg store, this cannot constitute an adverse employment action. *See, e.g., Valdes v. State of N.J.*, No. 05-3510, 2007 U.S. Dist. LEXIS 41038 (D.N.J. Jun. 6, 2007). To the extent that Plaintiff argues that his transfer to the Phillipsburg store was necessitated by the fact that that he was subjected to wrongful harassment by management at the Easton store, the Court will analyze that theory under Plaintiff's harassment claim, *infra*.

Next, Plaintiff's contention that the loss of his key holder responsibility is evidence of disability discrimination fares no better for several reasons. First, while management, at times, trusted Plaintiff to open or close the store when a manager was not available, as a LGA, being a key holder was not Plaintiff's duty or responsibility. Put differently, not giving Plaintiff key holder duties would not give rise to an inference of discrimination on the part of Defendant because those duties did not fall within Plaintiff's work description. Indeed, Plaintiff cannot claim discrimination when the decision for a LGA to act as a key holder was purely discretionary and did not materially change the terms of

his employment.  *See, e.g., Richardson v. Richland Cnty, Sch. Dist.,* 52 Fed. Appx. 615, 616 (4th Cir. 2002)(the availability of a key was not an adverse employment action because it did not have an adverse effect on the terms, conditions or benefits of employment); *Stutly v. Illinois Dept. of Corrections*, 263 F.3d 698, 702 (7th Cir. 2001); *McZeal v. Sch. Dist. of Phil.*, No. 09-2554, 2011 U.S. Dist. LEXIS 52467, at *16-17 (E.D. Pa. May 17, 2011)(denial of a keycard did not constitute an adverse employment action because it did not impact the plaintiff's ability to do her job); *Waheed v. SUNY Brooklyn Educ. Opp. Ctr.*, No. 04-5630, 2007 U.S. Dist. LEXIS 53580, at *18-19 (E.D.N.Y. Jul. 24, 2007)(collecting cases that a failure to provide plaintiff with a key to the office did not rise to the level of an adverse employment action since it had no discernible effect on her ability to work).

Moreover, there is no indication on this record that Plaintiff needed to carry a key to the Phillipsburg store to do his job when he transferred back to that store in January 2011, particularly since Plaintiff was never scheduled to work at the store on his own without management:

> Q:  When you transferred back to Phillipsburg after Easton, who were the key holders in the store?
>
> ...
>
> A:  It was Bill, Dan and Chris.
>
> Q:  So Chris is the store manager; Dan is the assistant manager; and Bill is the SGA?
>
> A:  Yes.
>
> Q:  And you went back there and continued in your role as LGA, correct?

A: Yes.

Q: But you never had a situation where you had to close?

A: No.

Q: So you never got the key because you didn't have to close?

A: Yes.

Pikowski Dep. at p. 248. Given the circumstances, even if it were true that Defendant decided to take away Plaintiff's key holder responsibility, I do not find that decision constitutes an adverse employment action, or gives rise to an inference of discrimination.

Finally, Defendant's decision not to promote Plaintiff to SGA did not take place under circumstances that would give rise to an inference of discrimination. To state a *prima facie* claim for failure-to-promote under the NJLAD, plaintiff must additionally show that he was rejected for the promotion and that nonmembers of plaintiff's protected class were treated more favorably. *See Andersen v. Exxon Co., U.S.A.*, 89 N.J. 483, 494 (1982); *Ayala v. N.J. Dep't of Law & Pub. Safety*, No. A-6125-09T1, 2011 N.J. Super. Unpub. LEXIS 2663, at *7 (App. Div. Oct. 25, 2011); *see also Smith v. Twp. of E. Greenwich*, 519 F. Supp. 2d 493, 506 (D.N.J. Oct. 30, 2007) (quoting *Rogers v. Alternative Res. Corp.*, 440 F. Supp. 2d 366, 371 (D.N.J. July 27, 2006)). With respect to this additional fourth element, plaintiff must establish that "'the promotion went to someone with equal or lesser qualifications who was not in the protected class.'" *Id.*; *see, e.g., Bermingham v. Sony Corp. of Am.*, 820 F. Supp. 834, 853-

54 (D.N.J. Nov. 20, 1992); *Pepe v. Rival Co.*, 85 F. Supp. 2d 349, 365 (D.N.J. Dec. 14, 1999) (citations omitted).

Here, Plaintiff maintains that because of his disabilities, he was "passed over" for a SGA position in three different GameStop locations: (1) Hackettstown; (2) Easton; and (3) Phillipsburg. As to the first location, besides Plaintiff's own suggestion that there was an opening, there is no evidence in this record that the GameStop store in Hackettstown had any openings for SGA during the relevant time period. As for the Easton location, while there was a SGA position available, Plaintiff decided to transfer to the Phillipsburg store in December 2010, before that position was filled. In other words, Plaintiff's choice to remove himself from consideration for the Easton store promotion precludes him from claiming discrimination on the part of Defendant. *See Peper v. Princeton Univ. Bd. of Trustee*, 77 N.J. 55, 86 (1978) (finding that plaintiff had no viable discrimination claim when she removed herself from consideration for a promotion by transferring out of the department).

Plaintiff also accuses Defendant of discrimination because GameStop decided to promote Mullen over Plaintiff for the SGA position at the Phillipsburg store, particularly since Plaintiff initially trained Mullen when he was first employed. However, Plaintiff's own statements at his deposition belie his position. When questioned by counsel why Plaintiff thought Mullen was promoted over Plaintiff, Plaintiff answered that he had "no clue." Pikowski Dep. at pp. 116, 149-50. Indeed, Plaintiff fails to show that Defendant acted with any discriminatory intent when it promoted Mullen. This is significant

because in order for Plaintiff to properly establish his *prima facie* case, he must carry his burden of demonstrating that Defendant hired Mullen over him for discriminatory reasons. This aspect of his failure-to-promote claim falls short because of his failure to do so.

Furthermore, Plaintiff has failed to show that any of the SGA positions "went to someone with equal or lesser qualifications who was not in the protected class." *Smith*, 519 F. Supp. 2d at 506. Plaintiff has not proffered any evidence that Mullen, or any other candidate hired as a SGA, had equal or lesser qualifications than Plaintiff or was not in Plaintiff's protected class. Therefore, based on the totality of the evidence, Plaintiff has failed to sufficiently establish his *prima facie* case for his failure-to-promote claim.

I note that while Plaintiff brings a retaliation claim under the NJLAD,[5] he makes no substantive arguments why such a claim should survive summary judgment. Based on Plaintiff's failure to oppose summary judgment on this claim, his retaliation claim is dismissed. *See, e.g.*, *Veer v. Maibec Inc.*, No. 11-3951, 2012 U.S. Dist. LEXIS 158247, at *12 (D.N.J. Nov. 5, 2012); *Sunkett v. Nat'l Gypsum Co.*, No. 09-721, 2011 U.S. Dist. LEXIS 146450, at *48 (D.N.J. Dec. 21, 2011)(granting unopposed summary judgment as to plaintiff's discrimination claims); *Marley v. CORT Furniture Rental Corp.*, No. 06-4926, 2008 U.S. Dist. LEXIS 69383, at *2 n.3 (D.N.J. Aug. 26, 2008) (same).

---

[5]   In order to establish a *prima facie* case of retaliation under NJLAD, Plaintiff must show: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with employee's protected activity; and (3) a casual connection between the employee's protected activity and the employers' adverse action." *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002); *Tartaglia v. UBS PaineWebber, Inc.*, 197 N.J. 81, 125 (2008).

However, even on the merits, Plaintiff cannot meet his burden of showing a *prima facie* case because, as noted above, he has failed to establish any adverse employment action, or, more importantly, a causal connection between his complaints made to management and any purported adverse employment action. Accordingly, Plaintiff's retaliation claim is likewise dismissed.

## III. Hostile Work Environment

A hostile work environment claim under the NJLAD requires the plaintiff to show conduct that is so "severe or pervasive" that **a reasonable person in the protected class** would believe that "the conditions of employment are altered and the working environment is hostile or abusive." [6] *Anastasia v. Wakefield*, 455 Fed. Appx. 236, 239 (3d Cir. 2011) (citing *Lehmann v. Toys 'R' Us*, 132 N.J. 587, 602 (1993)). Whether conduct is "severe or pervasive" for purposes of the NJLAD depends on, among other things, whether the conduct is frequent, whether it is physically threatening or merely verbally offensive, and whether it unreasonably interferes with plaintiff's job performance. *Id.*; *Godfrey v. Princeton Theological Seminary*, 196 N.J. 178, 195 (2008); *cf. Baliko v. Int'l Union of Operating Eng'rs*, 322 N.J. Super. 261 (App. Div. 1999) (listing other factors). The conduct must be judged on a cumulative basis in light of the "totality of the relevant circumstances." *Godfrey*, 196 N.J. at 195-96.

---

[6] Plaintiff submits a psychiatric evaluation that outlines some adverse medical impact that Plaintiff's working condition had on him. However, since the test requires the Court to analyze Plaintiff's alleged incidents of harassment through the lens of a reasonable person in Plaintiff's protected class, Plaintiff's personal medical evaluation is not probative on this issue. Therefore, I will not consider Plaintiff's medical reports when determining whether Plaintiff has properly established a hostile work environment claim.

The New Jersey Supreme Court has instructed that "it is insufficient to assess incidents individually as if each were hermetically sealed from the others." *Id.* at 196. In most cases, it is the cumulative impact of successive incidents from which springs a fully formed hostile work environment. Additionally, when determining whether harassing conduct has created a hostile work environment, that behavior must not be evaluated based on its effect on the plaintiff, but rather, whether the effect of such conduct makes a work environment hostile for a reasonable person. *Id.* at 197. This test was adopted to keep "harassing conduct tied to reasonable community standards and yet allow for its evolution as societal norms mature." *Id.*

In short, a claim for disability harassment requires plaintiff to show that the harassment (1) would not have occurred but for the employee's protected status, and was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment have been altered and that the working environment is hostile or abusive. *Shepard v. Hunterdon Developmental Ctr.*, 174 N.J. 1, 28 (2002).

Here, Plaintiff argues that a genuine issue of material fact exists as to whether Defendant's conduct through its managers, viewed in *toto*, was sufficiently pervasive and severe to constitute workplace harassment. In support of his position, Plaintiff points to the following incidents which occurred over approximately two years:

1. Rivera's alleged statement that "there's nothing wrong with [Plaintiff]" and that Plaintiff "get the fuck out of [his] store"[7];

2. Afram's alleged comment to Keller, "boy, that guy [Plaintiff] is really weird"[8];

3. Fego allegedly kicking the video console across the floor Plaintiff intended to purchase;

4. Fego rubbing a cable he allegedly claimed was contaminated by dog feces over a game Plaintiff intended to purchase;

5. George's alleged use of "retard" and "sped" on several occasions to refer to Plaintiff;

6. George kicking Plaintiff in the buttocks;

7. Severely cutting Plaintiff's hours when he returned to the Phillipsburg store;[9] and

8. Fego's alleged comment that he does not want Plaintiff back at the Phillipsburg store;[10] and

---

[7] Even if Rivera made those untoward comments to Plaintiff, they were not made in the context of a workplace environment because Plaintiff went to Rivera's store as a consumer to purchase a game, not as an employee. Therefore, this incident cannot form a basis of Plaintiff's hostile work environment claim.

[8] This statement is problematic for two reasons. For one, the comment was not made to Plaintiff, but rather to Keller, Plaintiff's then-store manager. As a result, Plaintiff cannot claim that Afram subjected him to harassment when the comment was not directed personally at him. Moreover, because it is hearsay, I cannot consider this statement.

[9] Since I have already addressed that Plaintiff agreed to the reduction in work hours when he returned to work at the Phillipsburg store, I will not consider this conduct as part of Plaintiff's harassment claim. Rather, to the extent Plaintiff argues that the transfer was made necessary because of the working conditions at the Easton store, I will consider that fact in the hostile work environment analysis.

[10] Since I already determined that this statement is hearsay, *supra*, I will not consider this comment as part of Defendant's pattern of harassment.

9. Two former co-workers "would not even look at [Plaintiff]" when he visited the Phillipsburg store on New Year's Day. [11]

Based on these alleged incidents, I find that Plaintiff has sufficiently raised a genuine issue of material fact as to whether the aforementioned conduct, cumulatively, constitutes workplace harassment. Before I begin, I note that there is no dispute that the GameStop employees, including the managers, were aware of Plaintiff's disability.

With respect to the first element, Defendant argues that there is no evidence that because of Plaintiff's disability, George kicked Plaintiff in his buttocks. Consequently, Defendant maintains that Plaintiff cannot use this conduct as part of a pattern of harassment. I do not agree. Indeed, Plaintiff must demonstrate that his disability played a role in the harassment, or in other words, Plaintiff's disability was a motivating factor in George's decision to kick him. In that regard, Plaintiff testified that while he did not know definitively the reason why George kicked him, he believed that it occurred because George treated him negatively because of his disability, including the fact that his disability made him a bit slower in performance. *See* Pikowski Dep. at p. 161-62. Indeed, based on the record, George, on several occasions, referred to Plaintiff as "retard" or "sped," which could be construed as negative comments related to Plaintiff's disability. In fact, because of those alleged untoward comments and the kicking incident, GameStop required George and

---

[11] Other than Plaintiff's own conjecture, he has not presented any cogent evidence that would indicate that these former coworkers ignored Plaintiff *because* of his disability and not because of other reasons. As such, I will not weigh them in my hostile work environment analysis.

the rest of the Easton employees to complete a respectful-workplace training course. Accordingly, I find that Plaintiff has raised a genuine issue of material fact that George's act of kicking Plaintiff may have been motivated by Plaintiff's disability, and thus, I will consider this incident as a part of my analysis as to whether Plaintiff was subjected to harassment.

As to the second factor, Defendant submits that the alleged harassing incidents were not severe or pervasive to alter the conditions of Plaintiff's employment or to create an abusive working environment. At the outset, I recognize that "a hostile work environment discrimination claim cannot be established by . . . comments which are 'merely offensive.'" *Heitzman v. Monmouth Cnty.*, 321 N.J. Super. 133, 147 (App. Div. 1999) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Neither rude and uncivil behavior nor offensive comments alone create a hostile work environment under the LAD. *Shepherd*, 174 N.J. at 25. However, in this case, the comments made, and conduct committed, by managers in two separate GameStop stores, i.e., George and Fego, were not merely rude or offensive, but rather, those alleged behaviors, if true, were taken to harass Plaintiff because of his disability. In that regard, I must consider, here, whether Plaintiff has raised a triable issue whether those alleged incidents were sufficiently pervasive or severe that a reasonable person in Plaintiff's protected class would consider Plaintiff's working environment abusive or hostile. I answer that in the affirmative.

Since the inception of Plaintiff's employment at GameStop, he encountered incidents with management that a reasonable person could find to

be harassing. Indeed, Plaintiff's evidence paints a picture of widespread insensitivity towards his disability by managers, which ultimately led them to create an abusive or hostile work environment. To start, Plaintiff's store manager, Fego, allegedly related to Plaintiff that he rubbed a cable contaminated by dog feces over a game Plaintiff intended to purchase. Plaintiff suggests that Fego knew that by doing so, it would have an adverse impact on Plaintiff because of his severe phobia with contamination and germs. According to Defendant, however, such an incident never occurred even though a formal complaint was lodged by Plaintiff's mother. Plaintiff further avers that Fego continued to harass him by kicking a video console that Plaintiff intended to purchase across the floor so as to contaminate the console with germs. While Defendant also disputes this version of events and the motivation for Fego's actions, on this motion, it is not the Court's role to make credibility determinations, *see Hunt v. Cromartie*, 526 U.S. 541, 552 (1999); rather, Plaintiff has sufficiently raised a genuine issue of material fact as to whether Fego's conduct constituted harassment.

What is more, after Plaintiff transferred to the Easton store because of workplace conditions at Phillipsburg, the Easton store manager, George, allegedly called Plaintiff "retard" and "sped." There is no dispute that George was aware of Plaintiff's disability, and that he made those comments. Instead, Defendant contends that such comments were commonplace under George's supervision because the Easton store had a "relaxed" atmosphere. In addition, George allegedly kicked Plaintiff in the buttocks at the cash register. Although

according to Defendant, the kick was to get Plaintiff's attention, based on Plaintiff's evidence on how George had treated him, Plaintiff has sufficiently raised a triable fact as to whether George committed this conduct because of his attitude towards Plaintiff and his disability, or for other reasons. Again, these issues are disputed and I cannot make any credibility determinations on this motion.

In sum, viewed in their entirety, I find that a reasonable jury could find that the complained-of incidents of harassment presented by Plaintiff are sufficiently pervasive and severe to constitute harassment. Indeed, these behaviors, if true, go beyond being merely rude or offensive because they were aimed at belittling Plaintiff because of his disability.[12] Summary judgment is denied as to this claim.

## IV. Constructive Termination

As a corollary claim to his disability discrimination cause of action, Plaintiff argues that his resignation stemmed from Defendant's constructive discharge. To establish such a claim, Plaintiff must show that at the time he left his employment, he was subjected to working conditions "so intolerable

---

[12]  Defendant argues that because it took prompt remedial action after receiving Plaintiff's complaints, Plaintiff's harassment claims should fail. I disagree. Indeed, where an employer's response to an employee's complaint **stops** the harassment, the employer may not be held liable for it. *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 294 (3d Cir. 1999); *Bouton v. BMW of N. America, Inc.*, 29 F.3d 103, 110 (3d Cir. 1994). However, contrary to Defendant's position, while Defendant took some remedial actions to address Plaintiff's complaints of harassment, based on the record on this motion, the alleged incidents of harassment continued until Plaintiff resigned from his employment. Thus, Defendant may not invoke this defense to relieve it of its liability on this motion.

that a reasonable person would be forced to resign rather than continue to endure it." *Shepard*, 174 N.J. at 28. As the New Jersey Supreme Court has instructed, this standard "envisions a sense of outrageous, coercive and unconscionable requirements." *Id.*

There are subtle but discernible differences between the standard for a hostile work environment and the standard for constructive discharge. The hostile work environment claim requires "severe or pervasive" conduct that objectively "alters the conditions of employment" and is "hostile or abusive." *Id.* In contrast, constructive discharge requires not merely "severe or pervasive" conduct, but "conduct that is so intolerable that a reasonable person would be forced to resign rather than continue to endure it." *Jones v. Aluminum Shapes, Inc.*, 339 N.J. Super. 412, 428 (App. Div. 2001). Simply put, a constructive discharge claim requires more egregious conduct than that sufficient for a hostile work environment claim.

Plaintiff's sole support for constructive discharge is the reduction in work hours once he returned to the Phillipsburg store. As I have discussed previously, because Plaintiff voluntarily chose to transfer -- knowing that reduction in hours was possible -- he cannot now complain that Defendant constructively terminated him based on this reason alone. Moreover, being scheduled to work a few hours a week hardly constitutes an intolerable, outrageous or egregious working condition, particularly since Plaintiff volunteered to transfer. Nothing on this record shows that Plaintiff was subjected to any conduct at the Phillipsburg store, upon his return, that can be

the basis of a constructive discharge claim. Accordingly, this claim is dismissed.

## CONCLUSION

Based on the foregoing reasons, Defendant's summary judgment is **GRANTED** in part and **DENIED** as follows: Plaintiff's claims for disability discrimination and retaliation, as well as his claim for constructive discharge are dismissed. Defendant's motion as to Plaintiff's hostile work environment claim is denied; that claim may proceed to trial.

Dated: December 11, 2013 /s/ Freda L. Wolfson
Freda L. Wolfson, U.S.D.J.